(Slip Opinion)

# Discretion to Continue the Home-Confinement Placements of Federal Prisoners After the COVID-19 Emergency

This Office concluded in January 2021 that, when the COVID-19 emergency ends, the Bureau of Prisons will be required to recall all prisoners placed in extended home confinement under section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act who are not otherwise eligible for home confinement under 18 U.S.C. § 624(c)(2). Having been asked to reconsider, we now conclude that section 12003(b)(2) and the Bureau's preexisting authorities are better read to give the Bureau discretion to permit prisoners in extended home confinement to remain there.

December 21, 2021

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 ("CARES Act"), a comprehensive response to the emergent and unprecedented COVID-19 pandemic. One of the CARES Act's provisions, section 12003(b)(2), addresses the threat COVID-19 poses to a densely populated prison environment. Under certain circumstances, section 12003(b)(2) authorizes the Director of the Bureau of Prisons to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate." Absent the CARES Act, the first sentence of 18 U.S.C. § 3624(c)(2) would limit the duration of home confinement to the lesser of ten percent of a prisoner's sentence or six months. Section 12003(b)(2) removes those limits "[d]uring the covered emergency period," which is the period of the COVID-19 national emergency plus thirty days, if the Attorney General makes requisite findings. The CARES Act is silent as to what happens to a prisoner who was placed in "lengthened" home confinement but whose remaining sentence exceeds six months or ten percent when the covered emergency period ends. In January 2021, this Office advised that the Bureau of Prisons ("BOP") would be required to recall all such prisoners to correctional facilities because they are not otherwise eligible for home confinement under 18 U.S.C. § 3624(c)(2). *See Home Confinement of Federal Prisoners After the COVID-19 Emergency*, 45 Op. O.L.C. __ (Jan. 15, 2021) ("*Home Confinement*").

You have asked us to reconsider our earlier opinion. In the course of this reconsideration, BOP has provided us with additional briefing reflecting its consistent view that the CARES Act is "most reasonably" read not to require all prisoners to be returned to correctional facilities at the end of the emergency period. *See* Memorandum for Christopher H. Schroeder, Assistant Attorney General, Office of Legal Counsel, from Kenneth Hyle, General Counsel, BOP, *Re: Views Regarding OLC Opinion, "Home Confinement of Federal Prisoners After the COVID-19 Emergency" dated January 15, 2021*, at 2 (Dec. 10, 2021) ("BOP Memorandum"). BOP further explained that home-confinement decisions have always been made on an individual basis, and that such an individualized approach betters serves penological goals and accords with expectations about how home confinement has been administered.

We do not lightly depart from our precedents, and we have given the views expressed in our prior opinion careful and respectful consideration. Based upon a thorough review of the relevant text, structure, purpose, and legislative history—and a careful consideration of BOP's analysis of its own authority—we conclude that the better reading of section 12003(b)(2) and BOP's preexisting authorities does not require that prisoners in extended home confinement be returned *en masse* to correctional facilities when the emergency period ends. Even if the statute is considered ambiguous, BOP's view represents a reasonable reading that should be accorded deference in future litigation challenging its interpretation.

## I.

We begin by describing the structure and use of section 12003(b)(2), our Office's prior opinion, and BOP's view of its own authority.

## A.

Section 12003(b)(2) of the CARES Act reads in full:

> During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section

3624(c)(2) of title 18, United States Code, as the Director determines appropriate.

18 U.S.C. § 3621 (note). The first sentence of section 3624(c)(2) provides: "The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The effect of section 12003(b)(2) of the CARES Act is to authorize the BOP Director during the covered emergency period to remove the time limits of section 3624(c)(2) and "lengthen" them indefinitely. The "covered emergency period" is defined in section 12003(a)(2) as "the period beginning on the date which the President declared a national emergency under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the Coronavirus Disease 2019 (COVID-19) and ending on the date that is 30 days after the date on which the national emergency declaration terminates."

The President declared the COVID-19 pandemic a national emergency under the National Emergencies Act on March 13, 2020, prior to enactment of the CARES Act. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020). That emergency was extended on February 24, 2021 and is still in effect as of the date of this opinion. *See* Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic, 86 Fed. Reg. 11,599 (Feb. 24, 2021). The Attorney General found that COVID-19 emergency conditions were materially affecting the functioning of BOP on April 3, 2020. *See* Memorandum for the BOP Director from the Attorney General, *Re: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19*, at 1 (Apr. 3, 2020) ("Barr Memorandum"). Thus, from that date to the present, the BOP Director has exercised authority to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" beyond the ordinary statutory maximum of six months.

BOP has used its expanded authority to prioritize home confinement of prisoners who have completed at least twenty-five percent of their sentences and have less than eighteen months left, or who have completed at least fifty percent of their sentences. *See* Memorandum for Chief Executive Officers from Andre Matevousian et al., BOP, *Re: Home Confinement* at 2 (Apr. 13, 2021). Prisoners who do not meet BOP's criteria, but

have particular COVID-19 risk factors, are further evaluated on a case-by-case basis. *Id.* These risk criteria are related to those suggested by the Attorney General in a March 26, 2020 memorandum. *See* Memorandum for the BOP Director from the Attorney General, *Re: Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* at 1–2 (Mar. 26, 2020).

Since late March 2020 and as of December 6, 2021, BOP has placed 35,277 inmates in home confinement through use of all its authorities. BOP Memorandum at 5. As of that same date, 4,879 prisoners were in extended home confinement under the CARES Act, and at least 2,830[1] of this group would have to be returned to a correctional facility under the view expressed in our prior opinion if the emergency were to end immediately. *Id.*

## B.

Our prior conclusion that all home-confinement prisoners who did not fall within section 3624(c)(2)'s time limits must be returned to a correctional facility was based on a number of arguments. First, we reasoned that because the purpose of the CARES Act was to provide "a variety of forms of *temporary* emergency relief to address a once-in-a-century global pandemic" (emphasis added), the better reading of the statute is the one that confines its effects to the period of the pandemic emergency. *Home Confinement*, 45 Op. O.L.C. __, at *5. We concluded that it would be unprecedented to allow section 3624(c)(2) home-confinement placements to last years or even decades, and thus that Congress would not have "fundamentally altered the structure of home confinement beyond the emergency circumstances" without clearly saying so. *Id.* at *5–6. We also concluded that reading the statute to end extended placements with the emergency was a better fit with the goals of the CARES Act than a reading that would allow BOP discretion to create home-confinement placements of any length. Our understanding of the purpose of the

---

[1] This is the number of prisoners who have more than one year remaining on their sentences. The actual number of people whose remaining terms would exceed the time limits contained in section 3624(c)(2) would be greater. As of November 5, 2021, 289 prisoners on CARES Act home confinement have been returned to prison for violating their conditions of release or committing new crimes. BOP Memorandum at 6.

CARES Act, and its implications for section 12003(b)(2), was reinforced by a comparison with other sections of the act which have effects only for a limited time. *Id.* (citing the temporary nature of sections 1109, 1113, 1114, 1102(a)(2), 1108(c)(1), portions of section 2102, and sections 3201–3226).

We also found support for our prior conclusion in the fact that the CARES Act home-confinement authority expires "30 days *after* the date on which the national emergency declaration terminates." CARES Act § 12003(a)(2) (emphasis added); *see Home Confinement*, 45 Op. O.L.C. __, at *6–7. We reasoned that this 30-day grace period is best read as evidence of Congress's intent to have BOP return prisoners to correctional facilities: "If Congress had expected that the termination of the Director's expanded authority would have no operational effects on prisoners already in home confinement, then his placement authority could simply have terminated with the emergency." *Home Confinement*, 45 Op. O.L.C. __, at *6–7.

Finally, we argued that the use of the verb "to place" supported our reading. *See id.* at *7. BOP frequently interacts with prisoners in a home-confinement placement, including through daily monitoring, weekly in-person meetings, drug and alcohol testing, and counseling, and retains discretion to reconsider home confinement at any time. We concluded that "to place" in the context of BOP's home-confinement authority was best read as connoting an ongoing action that required ongoing legal authority, and not just authority to create an initial home-confinement placement. Once section 12003(b)(2) lapsed, we reasoned, BOP lacked legal authority to continue, in effect, to "place" prisoners in home confinement who had been initially put there during the covered emergency period but whose remaining sentences exceeded the time limits of section 3624(c)(2). We concluded therefore that BOP must return such prisoners to correctional facilities.

## C.

BOP was of the view at the time of our earlier opinion, and remains of the view today, that section 12003(b)(2) is "most reasonably interpreted" to give the Bureau discretion over which inmates to return to facilities and which to leave in home confinement at the end of the emergency period. BOP Memorandum at 2; *see also* E-mail for the Office of Legal

Counsel from Kenneth Hyle, General Counsel, BOP, *Re: Draft OLC opinion on the CARES Act home confinement authority* (Jan. 14, 2021, 2:46 PM). BOP emphasizes that, textually, the authority granted by section 12003(b)(2) that expires at the end of the covered emergency period is the authority of BOP to *lengthen* terms of home confinement, not the authority to let prisoners *remain* in home confinement: "Once a decision has been made to 'lengthen' a particular inmate's home confinement term, no further action (i.e., bringing the inmate back into secure custody from home confinement) is compelled or contemplated by the statute." BOP Memorandum at 3. BOP explains that additional authority for its ongoing monitoring of prisoners in home confinement, including additional authority to return a prisoner to a facility, comes from its general statutory authorities, including 18 U.S.C. § 3621(a), which commits prisoners "to the custody of the Bureau of Prisons until the expiration of the term imposed." *Id.* at 4.

BOP further notes that extended periods of home confinement are no longer unprecedented. *Id.* at 3. Specifically, the Second Chance Act of 2007, Pub. L. No. 110-199, 122 Stat. 657 (2008), created a pilot program for home confinement for certain elderly inmates that does not incorporate the timeframes of section 3624(c)(2). The First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, reauthorized and broadened this program by lowering the qualifying age from 65 to 60, including terminally ill offenders as well as elderly ones, and reducing the proportion of the sentence the prisoner must serve in a facility from three-quarters to two-thirds. This program can result in periods of home confinement considerably longer than those that can occur under section 3624(c)(2).[2] The First Step Act's emphasis on home confinement is also evident in its direction that BOP "shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted." First Step Act § 602, 132 Stat. at 5238 (codified at 18 U.S.C. § 3624(c)(2)). Moreover, BOP has informed us that it would not ordinarily return a prisoner from home confinement to secure custody without a

---

[2] The First Step Act also created a separate, expanded home-confinement program by which low-risk offenders can earn time credits for earlier transfer to pre-release custody, including home confinement, without regard to the time limits of section 3624(c)(2). *See* 18 U.S.C. § 3624(g).

disciplinary reason, and that the "widespread return of prisoners without a disciplinary reason would be unprecedented." BOP Memorandum at 4–5.

BOP cites this backdrop—the increased availability of longer-term home confinement to fit the penological needs of prisoners—as support for its conclusion that section 12003(b)(2) gives the Bureau discretion to continue home-confinement placements lawfully made during the covered emergency period. BOP argues that Congress's expansion of home confinement in recent years demonstrates that "the use of incarceration is being re-evaluated as compared to the societal benefits of non-custodial rehabilitative programs." *Id.* at 4. According to BOP, reading section 12003(b)(2) to confer discretion in returning prisoners to secure custody will let BOP determine "whether there is [an] actual penological reason for doing so." *Id.* at 5. BOP also underscores the vital importance of bedspace in a correctional system and notes that exercising discretion will allow the Bureau to "manage its resources in an efficient manner that considers both public safety and the needs of the individual offender." *Id.* at 4. If we agree with BOP's view of the statute, BOP plans to develop criteria to evaluate which prisoners should remain in home confinement and which should be returned to facilities for sound penological reasons. *Id.* at 5. Exercising discretion to return compliant prisoners from home confinement would still be a departure from BOP's ordinary practice. In these unique circumstances, however, BOP is of the view that individual determinations, based on criteria set by the agency, are most appropriate for balancing the Bureau's numerous penological goals and needs, as well as the needs of the prisoner. *Id*.

## II.

We conclude that the better reading of section 12003(b)(2) and BOP's other authorities is that BOP has discretion to permit prisoners in extended home confinement to remain there.

Importantly, neither section 12003(b)(2) nor any other relevant statutory authorities expressly requires or specifically addresses the possible return of prisoners from home confinement. The single change that provision makes in BOP's home-confinement authority is to "lengthen" the duration for which prisoners can be placed in home confinement under section 3624(c)(2).

"Lengthen" refers to a discrete act: once something is permissibly lengthened, no further or ongoing action is typically required. Here, once BOP has determined to lengthen the time remaining in a prisoner's sentence and assigned that prisoner to home confinement, the permissible time period to be in home confinement has been extended and no further action under the CARES Act is needed or contemplated. The discrete nature of "lengthen" in this context appears consistent with how the term is used throughout the code—such as agency decisions to "lengthen" a period of time required for promotion or "lengthen" the schedule for a certain environmental review. *See, e.g.*, 10 U.S.C. § 14303(c) ("Authority to lengthen minimum period in grade."); 23 U.S.C. § 139(g)(1)(D)(i) ("The lead agency may . . . lengthen a schedule established under subparagraph (B) for good cause."). Nothing in the CARES Act or any other statute convinces us that the expiration of the power to lengthen home-confinement placements necessarily operates to shorten home-confinement placements that were already lawfully lengthened.

Our prior opinion concluded that, once the emergency period ends, the absence of ongoing section 12003(b)(2) authority had to have such an effect. The opinion reasoned that the decision to "place" someone in home confinement requires "ongoing action"—for instance in the form of "daily monitoring, weekly in-person meetings, drug and alcohol testing, counseling, and more"—and therefore requires "continuing legal authority," which we thought was absent once section 12003(b)(2) expired. *Home Confinement*, 45 Op. O.L.C. __, at *7. For the same reason, although the verb "to place" may connote either an initial decision ("put") or an ongoing process ("station"), our opinion concluded that it was used only in the latter, ongoing sense, and so the loss of authority to place a prisoner in home confinement entailed the loss of authority to keep him there. *See* 11 *Oxford English Dictionary* 941 (2d ed. 1989) (defining "place" as "[t]o put or set in a particular place, position, or situation; to station"); *Home Confinement*, 45 Op. O.L.C. __, at *7.

Section 12003(b)(2), however, specifically addresses only the lengthening of the period of home confinement. The legal authority to "place" instead derives from section 3624(c)(2) ("[t]he authority under this subsection may be used to place a prisoner in home confinement"), and that power continues to exist after section 12003(b)(2) ceases to be operative. Section 12003(b)(2) removes the time limits from section 3624(c)(2) and

authorizes the use of that ongoing authority for a lengthened period. Appropriately focusing on the verb "lengthen" diminishes the importance of the sense in which the verb "place" is used, because even if "place" is meant to imply a continuing process, the authority for the entirety of that extended placement was created when its duration was lawfully "lengthened."

Separately, under section 3621(a), BOP has additional authority to continue extended home-confinement placements and their associated "ongoing administrative duties." *Home Confinement*, 45 Op. O.L.C. __, at *7. Section 3621(a) commits prisoners "to the custody of the Bureau of Prisons until the expiration of the term imposed," and provides general authority for BOP to continue managing and administering the placements of prisoners in that custody. *See* BOP Memorandum at 2.[3] Once BOP has lawfully lengthened the time a prisoner can be in home confinement using its section 12003(b)(2) authority, the custodial authority of section 3621(a) allows a home-confinement prisoner to remain where he or she has been lawfully placed. *See United States v. Wilson*, 503 U.S. 329, 335 (1992) (citing section 3621(a) for the proposition that "the Attorney General, through the BOP, has the responsibility for administering the sentence"); *United States v. Ko*, 739 F.3d 558, 561 (10th Cir. 2014) (stating that prisoners in home confinement under section 3624(c)(2) are still "serving a 'term of imprisonment'" and that "[w]hen read together, these statutes [sections 3621 and 3624] plainly indicate that a person is in the BOP's 'custody' while serving the remainder of a sentence in home confinement"). Similarly, either section 3621(a) or section 3621(b), which charges BOP with designating the "place of the prisoner's imprisonment," could provide any necessary authority for BOP to revoke home-confinement placements.

A comparison of sections 12003(b)(2) and 12003(c)(1) reinforces our conclusion that the expiration of the emergency period affects only BOP's authority to lengthen terms of home confinement, not its authority to

---

[3] We continue to believe that section 3621(a) does not provide authority to initially put prisoners in home confinement, because that reading would render many other provisions providing such authority (including section 3624(c)(2) and section 12003(b)(2)) surplusage. *Home Confinement*, 45 Op. O.L.C.__, at *14–15. Nor does BOP believe that section 3621(a) provides such initial placement authority. *Id.* at *10–11.

continue placements already made. The full text of section 12003(c)(1) reads as follows:

> During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau shall promulgate rules regarding the ability of inmates to conduct visitation through video teleconferencing and telephonically, free of charge to inmates, during the covered emergency period.

Section 12003(c)(1) uses the phrase "during the covered emergency period" twice, each with a different reference. The first use of "during the covered emergency period" defines when the Director may promulgate rules about videoconferencing, similar to the way the phrase is used in section 12003(b)(2). But the second use of the phrase refers to the "ability of inmates to conduct visitation through video teleconferencing and telephonically," thereby showing that this benefit was intended to end with the end of the covered emergency period. By contrast, section 12003(b)(2) uses the phrase "during the covered emergency period" just once—stating that "[d]uring the covered emergency period . . . the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement." This single use of "during the covered emergency period" makes clear that the Director's lengthening may occur only during the covered emergency period, but the provision is silent on whether home confinement may outlast that period. The absence of an end date for the benefit conferred by section 12003(b)(2)—even though the very next subsection includes one—leads to the reasonable inference that Congress intended to permit the extended home-confinement placements granted under section 12003(b)(2) to outlast the emergency period. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Salinas v. U.S. R.R. Retirement Bd.*, 141 S. Ct. 691, 698 (2021) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

The reasonable inference that Congress intended to leave the length of home-confinement placements to BOP's discretion is further suggested by the language with which Congress ended section 12003(b)(2)—not a

restrictive restatement of the covered emergency period, but an explicit delegation of authority: "as the Director determines appropriate." As this Office and the federal courts have long recognized, such phrasing—which leaves the appropriateness of decisions to lengthen home confinement in the Director's hands—is a particularly broad textual commitment of authority. *See The Twenty-Second Decennial Census*, 18 Op. O.L.C. 184, 196 (1994) (describing a provision allowing a Census of "such form and content as [the Director] may determine," 13 U.S.C. § 141(a), as part of a "broad delegation of power" to the Census Bureau); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019) (noting that 13 U.S.C. § 141(a) "confers broad authority"); *see also Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976); *Nat'l Small Shipments Traffic Conf., Inc. v. Civ. Aeronautics Bd.*, 618 F.2d 819, 827 (D.C. Cir. 1980). The language of section 12003(b)(2) "fairly exudes deference to the Director." *Cf. Webster v. Doe*, 486 U.S. 592, 600 (1988).

The structure and purpose of the CARES Act and section 12003(b)(2), moreover, reinforce our interpretation. We no longer believe that the inclusion of the 30-day grace period in the "covered emergency period" necessarily suggests that Congress intended BOP to return prisoners to facilities. *Home Confinement*, 45 Op. O.L.C. __, at *6–7. There are other plausible explanations for providing such a period. For example, the grace period could have been included to finish processing home-confinement placements that were planned or in progress—and to which BOP had already devoted resources—since home-confinement placements require a complex assessment of factors and take some time to implement. *See* Barr Memorandum at 3; *see also* BOP Memorandum at 4. Or it could have been included to give BOP time to reorient its resources: regardless of whether individuals in home confinement are recalled, the end of the emergency period would cause an increase in the prison population because new prisoners would continue to come into the prison system but no new extended home-confinement placements would occur. The 30-day period would thus allow BOP time to prepare for this change. *See* BOP Memorandum at 4. More generally, Congress may simply have included this grace period for administrative convenience: to account for unforeseeable operational difficulties the end of the emergency period would cause for BOP.

While there is no legislative history suggesting why the 30-day expiration period was included, it would be somewhat odd if Congress thought that prisoners in extended home confinement must be returned to a facility and included the expiration period for that reason, but failed to state in the text that prisoners must be so returned. Additionally, the 30-day expiration provision also applies to section 12003(c)(1), which provides for video- and tele-conferencing free of charge to inmates during the emergency period. There is no obvious reason—other than administrative convenience—why video- and tele-conferencing would need a 30-day wind-up period. The inclusion of that same covered period in section 12003(c)(1) undercuts our prior opinion's reliance on those 30 days.

Nor does the temporary nature of other programs created by the CARES Act mean that extended home-confinement placements must end with the covered emergency period. *See Home Confinement*, 45 Op. O.L.C. __, at *5–6. No one disputes that BOP's authority to lengthen the maximum period of home confinement for prisoners ends when the covered emergency period ends; in that sense the home-confinement provision is unambiguously temporary. The fact that the expanded placement authority is temporary, however, does not entail that the consequences of such placements need also be temporary. Indeed, the consequences of other CARES Act authorities will extend past the emergency as well: loans granted under the Paycheck Protection Program created by sections 1102 and 1109, for instance, were only available for a limited period, but once awarded these loans will mature over time and thus have long-term consequences.

Of course, the overall purpose of the CARES Act was to provide temporary relief for problems related to the pandemic, and so reading a provision to have lingering effects once the pandemic has ended may at first seem anomalous. *See Home Confinement*, 45 Op. O.L.C. __, at *5–6. But Congress enacted section 12003(b)(2) in the context of the heightened pandemic-related risks the federal prison system was experiencing, because the close quarters and dense populations of inmates and guards created an environment conducive to the spread of the virus. From the vantagepoint of Congress's enacting prospective relief, it would have been rational to conclude that the pandemic risks in prison facilities might linger well beyond the official end of the pandemic emergency.

In the end, we find little interpretive guidance in the purpose of section 12003(b)(2). Nor does the legislative history provide any guidance on what Congress intended—if, indeed, it thought about the consequences of the end of the emergency period at all. There is no legislative history reflecting what members of Congress thought would happen at the end of the emergency period. Nor does the relevant Attorney General memorandum from that period (the Barr Memorandum)—issued just a week after the CARES Act was signed into law—contain any mention of the prospect of a mass return to prison facilities. This is an especially significant omission in light of the fact that more individually dramatic measures, such as compassionate release, were part of the national discussion, and reflects the fact that few officials gave serious consideration to the prospect of a large-scale return at the time the CARES Act was passed.[4]

---

[4] For a contemporaneous discussion of compassionate release, *see* U.S. Sentencing Comm'n, *Compassionate Release Data Report: Calendar Years 2020 to 2021* (Sept. 2021). We have located several post-enactment press releases from individual senators immediately after passage of the CARES Act—which we do not consider part of the legislative history, *see Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011)—that are at odds with the view that the BOP Director may reasonably continue certain home-confinement placements after the emergency period. *See, e.g.*, Press Release, *Durbin*, *Duckworth Outline Illinois Priorities Included in Senate-Passed Bipartisan COVID-19 Pandemic Relief Bill* (Mar. 26, 2020), https://perma.cc/5N5W-SR8W (reflecting the view that the CARES Act "gives BOP discretion to extend pre-release home confinement from a maximum of 6 months to a maximum of 12 months"). Some of these positions were subsequently abandoned. *See* Letter for Merrick Garland, Attorney General, from Richard J. Durbin & Cory A. Booker, U.S. Senate (Apr. 23, 2021), https://perma.cc/2WM8-E866.

These brief post-enactment statements did not explain their reasoning for implying a 12-month cap, but may have been based on 18 U.S.C. § 3624(c)(1), which limits pre-release custody generally, rather than home confinement specifically, to a maximum of twelve months. But such a limit on section 12003(b)(2) is not reflected anywhere in the legislative record, discussed in our Office's prior opinion, or mentioned in any agency statements. More importantly, restricting section 12003(b)(2) to the final year of a prisoner's sentence would dramatically curtail BOP's ability to use home confinement to reduce the prison population and prevent the pandemic's spread—an implausible result that appears fundamentally at odds with section 12003(b)(2)'s central goal and BOP's public actions since March 2020. *See King v. Burwell*, 576 U.S. 473, 492 (2015); *see also N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes."). Under such an interpretation, nearly half of the approximately 7,800 inmates currently in home confinement under the CARES Act would need to be returned to prison immediately, notwithstanding the ongoing pandemic emergency.

Moreover, focusing solely on the purpose of the CARES Act would overlook the broader purpose of home confinement, which is to "afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." 18 U.S.C. § 3624(c)(1). BOP's program statement on home confinement describes it as "a time of testing and an opportunity for inmates to assume increasing levels of personal responsibility while providing sufficient restriction to promote community safety and continue the sanction of the sentence." BOP Program Statement, CCD No. 7320.01 (Sept. 6, 1995) (updated and reissued Dec. 15, 2017). For these reasons, home confinement is generally supposed to occur at the end of a prisoner's sentence as a terminal placement. *See* 18 U.S.C. § 3624(c)(1) (stating that, to the extent practicable, prisoners should be placed in prerelease custody during "the final months" of their term of imprisonment); BOP Memorandum at 4 ("The benefits to home confinement from a penological standpoint is as one of the last steps of a reentry program" that "provide[s] transition back into the community with support, resources, and supervision from the agency."). In some cases, of course, BOP might reasonably conclude that penological goals would be best served by returning a prisoner in home confinement to a prison facility. Yet it would run counter to home confinement's penological purpose to *require* BOP, without ability to consider individual needs and equities, to pull prisoners who had been succeeding in home confinement back into the more restrictive prison environment. *See* BOP Memorandum at 4 ("Under regular circumstances, inmates who have made this transition to home confinement would not be returned to a secured facility, unless there was a disciplinary reason for doing so, as the benefit of home confinement is to adjust to life back in the community, and therefore removal from the community would obviously frustrate that goal."). As noted above, such a blanket recall would be unprecedented. By contrast, long-term home confinement—while not the norm—is becoming less unusual, given the measures Congress has adopted authorizing longer home-confinement placements for elderly and terminally ill offenders. *See supra* Part I.C.; *see also* 34 U.S.C. § 60541.

Our prior opinion argued that if Congress had "fundamentally altered the structure of home confinement" in a way that might permit multi-year home-confinement placements, it would have been more explicit about doing so. *Home Confinement*, 45 Op. O.L.C. __, at \*6 (citing *Whitman v.*

*Am Trucking Ass'ns*, 531 U.S. 457, 468 (2001), for the proposition that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions"). But we are less convinced that multi-year placements would entail a fundamental alteration of home confinement, and it equally could be contended that, if Congress had intended an unprecedented and penologically unjustified mass recall of prisoners from home confinement, it would have said so.

## III.

For the reasons described in Part II, we conclude that our prior opinion failed to address important and persuasive counterarguments. We now believe that a better reading of section 12003(b)(2) grants BOP discretion to permit prisoners in extended home confinement to remain there. Even if the statute were considered ambiguous, BOP's view represents a reasonable reading that should be accorded deference in future litigation challenging its interpretation. It accords with section 12003(b)(2)'s text, structure, and purpose, and it also makes eminent sense in light of the penological goals of home confinement. BOP's interpretation avoids requiring the agency to disrupt the community connections these prisoners have developed in aid of their eventual reentry. Instead, it allows the agency to use its expertise to recall prisoners only where penologically justified, and avoids a blanket, one-size-fits-all policy. We thus depart from the view of our January 2021 opinion concerning section 12003(b)(2).[5]

CHRISTOPHER H. SCHROEDER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[5] We do not address any issues related to the January 2021 opinion's conclusions concerning BOP's discretion under 18 U.S.C. § 3621(b). *See Home Confinement*, 45 Op. O.L.C. __, at *7–14.